## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN JONES, derivatively on behalf of LANTHEUS HOLDINGS, INC., | |
| Plaintiff, | Case No. |
| v. | |
| BRIAN A. MARKISON, MARY ANNE HEINO, MINNIE BAYLOR-HENRY, GÉRARD BER, JULIE EASTLAND, SAMUEL LENO, HEINZ MÄUSLI, JULIE MCHUGH, PHUONG KHANH MORROW, GARY J. PRUDEN, JAMES H. THRALL, PAUL M. BLANCHFIELD, ROBERT J. MARSHALL, and AMANDA MORGAN, | JURY TRIAL DEMANDED |
| Defendants, | |
| -and- | |
| LANTHEUS HOLDINGS, INC., a Massachusetts Corporation, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Brian Jones ("Plaintiff"), derivatively on behalf of Lantheus Holdings, Inc. ("Lantheus" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Margolis vs. Lantheus Holdings, Inc. et al.*, Case No.: 1:25-cv-07491 (S.D.N.Y) (the "Securities Class Action"); (iii) corporate

governance documents available on the Company's website; (iv) media reports; and (v) other publicly available information.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff, a stockholder of Lantheus, on behalf of the Company against the Defendants (as defined herein).  This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least February 26, 2025, to August 5, 2025 (the "Relevant Time Period"). During that time the Defendants (as defined herein) caused or allowed Lantheus to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2.      Lantheus develops, manufactures, sells, and distributes diagnostic and therapeutic products to cardiologists, oncologists, radiologists, and other healthcare professionals throughout the globe. The Company's products generally fall into three categories: Radiopharmaceutical Oncology, meant to treat cancer; Precision Diagnostics, meant to diagnose primarily cardiologic diseases; and Strategic Partnerships, which include biomarkers and digital products to support the Company's partners' development efforts.

3.      The Company's key product is Pylarify, a PET imaging agent used to assist in both diagnosing and subsequently treating prostate cancer. In 2024, Pylarify accounted for 69% of Lantheus' $1.5 billion in total revenues, bringing in $1 billion in revenues that year. However, the Company faces stiff competition for Pylarify, which is due to lose its new chemical entity exclusivity in 2026.

4.      Throughout the Relevant Time Period, the Company and Defendants assured investors that Pylarify would remain a successful product for the Company. Concerns about competition were downplayed, as the Defendants touted Pylarify's market position and price point

as proof of the Company's ability to meet forecasted revenue and growth. However, the statements masked the truth that Lantheus could not properly assess the impact of pricing and competitive dynamics for Pylarify. Specifically, the Company failed to inform investors that the price increase for Pylarify made early in 2025 created an opportunity for competitive pricing that compromised Pylarify's revenues and overall growth potential.

5.      The full truth finally emerged on August 6, 2025, when Lantheus announced that it had significantly reduced growth expectations for Pylarify, and slashed fiscal year 2025 growth projections. Defendants attributed the dramatic change to ongoing competition impacting Pylarify's pricing dynamics.  On this news, the price of Lantheus's common stock fell from a closing market price of $72.83 per share on August 5, 2025, to $51.87 per share on August 6, 2025, a decline of about 28.8% in the span of one day.

6.      Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements, as well as the inadequate internal controls that allowed the misconduct to occur, in breach of their fiduciary duties to the Company.

## PARTIES

### A.      Plaintiff

7.      Plaintiff Brian Jones is a current shareholder of Lantheus and has continuously held Lantheus stock during all times relevant hereto and is committed to retaining Lantheus shares through the pendency of this action to preserve his standing.  Plaintiff will adequately and fairly represent the interests of Lantheus and its shareholders in enforcing its rights.

**B.    Nominal Defendant**

8.    Nominal Defendant Lantheus is a corporation organized and existing under the laws of the State of Massachusetts. The Company's principal executive offices are located at 201 Burlington Road, South Building, Bedford, MA 01730. Lantheus common stock trades on the NASDAQ under the ticker symbol "LNTH."

**C.    Individual Defendants**

9.    Defendant Brian A. Markison has served as Chief Executive Officer ("CEO") of the Company since March 2024, and has been a director of the Company since 2012.

10.    Defendant Mary Anne Heino has been a director of the Company since 2015 and currently serves as Chair of the Board. Defendant Heino served as CEO from 2015 until March 2024.

11.    Defendant Minnie Baylor-Henry has been a director of the Company since 2022.

12.    Defendant Gérard Ber has been a director of the Company since 2020.

13.    Defendant Julie Eastland has been a director of the Company since September 2024.

14.    Defendant Samuel Leno has been a director of the Company since 2012.

15.    Defendant Heinz Mäusli has been a director of the Company since 2020.

16.    Defendant Julie McHugh has been a director of the Company since 2017.

17.    Defendant Phuong Khanh Morrow has been a director of the Company since February 2025.

18.    Defendant Gary J. Pruden has been a director of the Company since 2018.

19.    Director James H. Thrall has been a director of the Company since 2018.

20.     Defendants Markison, Heino, Baylor-Henry, Ber, Eastland, Leno, Mäusli, McHugh, Morrow, Pruden, and Thrall are herein referred to as "Director Defendants."

21.     Defendant Paul M. Blanchfield has served as the President of the Company since 2023.

22.     Defendant Robert J. Marshall has served as the Chief Financial Officer and Treasurer of the Company since 2023.

23.     Defendant Amanda M. Morgan has served as the Chief Commercial Officer of the Company since March 2024.

24.     Defendants Blanchfield, Markison, Marshall and Morgan are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

28.     Venue is proper in this court under 28 U.S.C. § 1391, because Lantheus is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.     Company Background

29.     Founded as New England Nuclear in 1956, Lantheus focuses developing and manufacturing on radiopharmaceutical products to support healthcare professionals diagnose and treat cancer and other diseases. The Company's main product is Pylarify, an imaging agent used in diagnosing prostate cancer. Pylarify received U.S. Food and Drug Administration ("FDA") approval in 2021, after two successful clinical studies. Since receiving FDA approval, Pylarify has brought in $2.4 billion in revenues for Lantheus, from $43 million in 2021 to $1 billion in 2024. The vast majority of Lantheus's revenues can be attributed to sales of Pylarify.

### B.     Lantheus' False and Misleading Statements

30.     On February 26, 2025, the Company held a call with investors and analysts to discuss Lantheus' fourth quarter and full-year results for 2024.  During the call, Defendant Blanchfield touted Pylarify's success:

> With over $1 billion in sales, PYLARIFY remains the clear #1 utilized PSMA PET imaging agent. We plan to build on this success by growing both volume and net sales in 2025 and are confident that we will maintain our market leadership and relative price premium, even amidst competitive pressures.

> PYLARIFY sales for the quarter were $266 million, up 15.7% year-over-year. Growth was driven by volume as net price was up approximately 1% year-over-year, even after taking a mid-single-digit price increase at the beginning of 2024. Quarter-over-quarter, we grew volumes just shy of 2%, with net price essentially flat.

*       *       *

We took an almost 6% WACC price increase earlier in 2025 and expect PYLARIFY's clinical and commercial differentiation to continue to support its clear market leadership and premium pricing.

31.    Defendant Marshall then discussed financial results and guidance for 2025,

stating:

Revenue for the fourth quarter was $391.1 million, an increase of 10.5% and revenue for the full year was $1.534 billion, an increase of 18.3%. Now turning to the details, beginning with radiopharmaceutical oncology, which contributed $266 million of sales in the quarter, up 15.3% due primarily to the continued strength of PYLARIFY with sales of $266 million, an increase of 15.7%. The difference in growth rates is due to a nominal amount of AZEDRA sales in the prior year results.

PYLARIFY posted full year sales of $1.058 billion, an increase of 24.3%.

*    *    *

Turning now to guidance for 2025 full year. And recall, we are only providing full year guidance this year.

*    *    *

We estimate full year net revenue to be in the range of $1.545 billion to $1.61 billion an increase of 1% to 5% over 2024. We expect PYLARIFY to grow low to mid-single digits on a net basis.

32.    During the question-and-answer session that followed, Defendants elaborated

further on the Company's guidance, particularly as it relates to the competitive and pricing

dynamics of Pylarify:

<Q: Anthony Charles Petrone – Mizuho Securities USA LLC – MD & Senior Equity Research Analyst of Medical Devices, Diagnostics, & Therapeutics> . . . So maybe one, just a little bit on the competitive dynamics with the new reimbursement change that's effective January 1. I know you mentioned most of your customers are now contracted, but just anything you're seeing competitively of market shifts as this new reimbursement code has come in? And then secondly, the competitors out there looking at basically a reengineered, reformulated version, if you will, of their PSMA PET agent. Just expectations on that on whether or not that's baked into the guide. And what you think that does for the competitive landscape. And congrats on a strong year all around.

<A: Brian A. Markison> Yes. Thanks, Anthony. I'll start with the back end of your question and then turn it over to Paul and Amanda for the second half -- or the first question -- part of the question anyway. With regard to a new product entrant, I

think it's gallium. The images are not as good as PYLARIFY images. There's been a little bit of noise about it. I don't really see a big sort of influx to anything that's happening with PYLARIFY, so they're doing what they're doing good for them, and we're going to keep on executing our game plan. So Paul?

<A: Paul M. Blanchfield> . . . So I think as we said, I think we're incredibly excited about the CMS shift to MUC versus where we were previously expected to be from the expiry of transitional pass-through payment status. And this is clearly a benefit for PYLARIFY. But I think more broadly, as the clear leader in radiopharmaceutical diagnostics, with PYLARIFY, an incredibly strong pipeline with MK-6240, of NAV-4694, of our FAP agent earlier in development as well as some of the pending acquisitions with the addition of OCTEVY, of Neuraceq and earlier-stage theranostic pairs, I think we're incredibly pleased for the long-term growth potential, sustainability and payment dynamics related to MUC.

\*      \*      \*

<A: Amanda Morgan> Yes. Thanks, Paul. So as we shared on our commentary during the call that we secured the vast majority of hospital and freestanding imaging centers with multiyear contracts. This will enable us to continue to leverage our strategic partnerships. What I'll say is that I'm very pleased with the evolution of this strategy and the partnerships. We expect to continue to capitalize on PYLARIFY's clinical and commercial differentiation to support its clear market leadership and pricing premium even with the current competitive market dynamics.

So just kind of talking a little bit more about our commercial differentiation and our clinical differentiation, from a commercial differentiation perspective, we have the largest dedicated commercial team. Additionally, we have broad payer access with more than 90% of lives having access to PYLARIFY. We have a longer half-life, which is a distribution advantage, and that enables us to optimize on our multipartner manufacturing facility network. This makes PYLARIFY widely available through a diverse supply chain, ensuring convenient and reliable supply in over 48 states.

And then from a clinical differentiation perspective, there's really 3 things. There's clarity from a diagnostic perspective, meaning accurate detection rate without the high false positive rate. We have clarity in intended patient management, which is based on robust pivotal clinical data and clarity from consistency and reader interpretation or high inter-reader agreement. So by driving differentiation through clinical and commercial differentiation, our long-term strategic partnerships and an optimal customer experience, we plan to continue to grow PYLARIFY both in volume and net sales in 2025.

\*      \*      \*

<Q: Lawrence Scott Solow – CJS Securities, Inc. – Managing Director of Research> I guess I just wanted to -- just follow up on Richard's question on the cadence of the year. I guess, we can infer that the impact of price, obviously, is waning in the back half. So my question is kind of what does that mean as we look out to '26? Should we actually expect -- guidance for '26. But long term, this should sound like it's a 1-year reset. Should we expect kind of price to at least not be a headwind as we look out into '26? And the second part of that question is just, I don't know if you can give us a little more concrete numbers here, but it felt like the price impact in the back half of this year or Q4 was pretty muted. So I assume there will be some impact, right? Going forward, at least in the front half of the year.

<A: Robert J. Marshall> Yes, Larry, thanks for that question. I think your assessment is right that this year 2025 is going to be more reflective of the price dynamics as we anniversary through the strategic contracting with our partners. And so the normal seasonality, if you will, isn't necessarily going to be reflective within the PYLARIFY franchise. We will see seasonality that we normally see with the DEFINITY, for instance. But as we look into 2026, as we anniversary through, yes, we do have a sense of bringing those sort of foundational products in PYLARIFY and DEFINITY back to more of a seasonally cadence sort of flow, if you will, of revenue stream.

<A: Paul M. Blanchfield> Maybe just to add, Larry, on the specific kind of pricing dynamics. In the second half of '24, we did see sequential declines. If you look at the first half of '24 pricing and you look at the second half of '24 pricing from an actual realized, we did see a decline. Now that's with the overall raising prices and others that helps offset some of those. But that will normalize, as Bob has mentioned, as we get to the second half of '25 because those year-over-year comps are now included in that. We did take a mid-single-digit price increase at the beginning of '24. We highlighted that we did the same slightly earlier in '25 this year.

33.    On May 7, 2025, the Company issued a press release announcing financial results for the first quarter 2025. The press release disclosed that Lantheus had performed below market expectations, with Pylarify sales of $257.7 million, a decrease of 0.5%, and further disclosed that the Company had lowered its full-year prior projections.

34.    That day, the Company held a call with analysts and investors to discuss the released financial results. During that call, Defendant Morgan elaborated on Pylarify's performance, acknowledging "temporal" setbacks while assuring investors as to Pylarify's progress, stating:

PYLARIFY sales for the first quarter were $258 million, with year-over-year volume growth, offset by low single-digit decline in net price. We have successfully executed our strategy to secure the vast majority of PYLARIFY revenue through strategic partnerships with key hospitals and freestanding imaging centers. However, with the expiry of PYLARIFY pass-through status and the implementation of mean unit cost payments for Medicare, FFS in the hospital outpatient setting we did experience what we believe will be temporal competitive disruption among smaller non-contracted sites.

We plan to maintain our market leadership, and we'll continue to work through these competitive pressures and grow volume and revenue in 2025. We will achieve this by broadening our contracting efforts while maintaining our pricing premium, expanding product availability in both earlier and later calibration time, educating on PYLARIFY's clinical and commercial differentiation and continuing to provide superior customer service.

35.     Defendant Marshall then provided more detail on Pylarify's performance in his prepared remarks, and announced reduced full-year revenue expectations, stating:

Consolidated net revenue for the first quarter was $372.8 million, an increase of 0.8%. Radiopharmaceutical oncology, currently PYLARIFY contributed $257.7 million of sales flat with the prior year. Precision Diagnostics revenue of $104.4 million was flat year-over-year.

\*     \*     \*

Turning now to our updated interim corporate guidance for the full year 2025 . . . our view of PYLARIFY performance for the balance of the year has come into sharper focus. We are updating the implicit PYLARIFY range embedded in the previously guided stand-alone Lantheus full year view of revenue. That said, we are shifting our implicit PYLARIFY year-over-year range to flat to low single- digit percent growth for the full year versus our prior view of low single-digit to mid-single-digit growth.

Commentary on all other Lantheus products remains the same.

\*     \*     \*

Additionally, the company advanced several R&D projects with positive ROI metrics, not previously considered in the prior guide. Therefore, R&D should be approximately 7.5% of revenue, up approximately 100 basis points for the full year.

For now, by only incorporating our PYLARIFY update, R&D investments and including Evergreen, we now see adjusted EPS in the range of $6.60 to $6.70 versus the prior guide of $7 and $7.20.

36.     A question-and-answer session followed, during which Defendants engaged in

multiple exchanges related to Pylarify's performance in the market, the competitive and pricing

dynamics therein, and the recently lowered projections:

>    <Q: Anthony Charles Petrone – Mizuho Americas LLC – MD of Senior Medical Devices, Diagnostics & Therapeutics Equity Research Analyst> Maybe start with PYLARIFY trends in the quarter. Obviously, good detail in the prepared remarks, but maybe just a little bit more on the competitive dynamics you're seeing out there. Certainly by our math, you're looking at a fair amount of share shift here through the March ending quarter. So a little bit on the PYLARIFY competitive dynamics? And I'll have one quick follow-up on gross margin.

>    <A: Paul M. Blanchfield> Yes. Thanks, Anthony. So I think in the first quarter, I'll add to what we -- and Amanda provided in the prepared remarks, we -- first, we were successful in securing the vast majority of our revenues through the strategic partnerships. Those, as we've stated before, have largely been with our long-standing and established hospitals and freestanding imaging centers, many of them who have been with us since launch.

>    Those partnerships were key to stabilizing the business, especially amidst the transition to mean unit cost from a Medicare fee-for-service reimbursement perspective. They're also going to serve us incredibly well as we launch a broader portfolio. In the quarter, we did experience short-term competitive disruption, specifically among the smaller non-contracted sites due to MUC-related reimbursement, price as well as product availability. These smaller sites have been more recent adopters of PSMA PET imaging. And as a result, they have been outpacing the broader PSMA pet market growth.

>    We continue to work through competitive pressures and some of these market dynamics. But we do plan to maintain our market leadership to grow volumes and revenues and to expand our contracting efforts with some of these higher growth later adopter accounts as well as expanding product availability to ensure that we can continue to meet the growth and ensure our growth grows closer to that of the broader market.

>    *    *    *

>    <Q: Roanna Clarissa H. Ruiz – Leerink Partners LLC, Research Division – Senior MD of Infectious Disease, Endocrine & Cardiovascular Disorders & Senior Research Analyst> Morning, everyone. So I was curious, I noticed you tightened your fiscal '25 guidance a bit. Could you talk a bit more about what drivers could put you on either the low end or the high end of that guidance year-end?

>    *    *    *

>    <A: Robert J. Marshall> Yes, I'll take it from a guidance perspective. So Roanna, I appreciate the question. We've narrowed the range, but we're now coalescing

around the bottom half of the prior range, and it really is about PYLARIFY. So we're still staying in basically what we had previously guided. It's just that Q1 was extremely informative on how the competitive environment would manage PYLARIFY as we came off pass-through. Our original view was a pretty wide range that contemplated a range of outcomes with the first half being flattish and then with low single to mid-single-digit to mid-single to high single-digit type of an outcome. So all we've done is sort of narrow this range to sort of -- to be at the bottom, we're taking like the bottom half of that original range. The key thing here, though, is we do still expect healthy dose volumes throughout the balance of the year. And that is why we related where we do.

*      *      *

<Q: Brian Kemp Dolliver – Brookline Capital Markets, LLC – Director of Research & Senior Biotechnology Analyst> On the smaller accounts in the market for PYLARIFY, are these accounts that are operating essentially on a spot basis? Or are they contracted with others? I'm trying to reconcile your position as a premium priced product with what looks like a customer base that might be commodity -- have a commodity mindset. So can you reconcile that for me?

<A: Brian A. Markison> Yes. I think we're looking at it a little bit differently. I think as we have grown our business and matched that with our growing PMF network, we have 63 PMF up and running in the country and our strategic contracts were designed to partner us for the long term with our highest volume early adopters. And I think what we're seeing is the smaller accounts that now have some capacity, were not initially our early focus as we were dealing with the major institutions. So Amanda, do you want to expand on that a little bit?

<A: Amanda M. Morgan> That's exactly right. As we continue to evolve, as Paul shared in his prepared remarks, as we continue to evolve in the market, we are continuing to grow and expand our product availability and that will be through our earlier and later calibration times. That will enable us to not only partner, as Brian said, with our largest strategic accounts, but also partner with the smaller accounts, so those later adopters that are continuing other uptake of PSMA PET.

37.     Even with the lowered projections, the Company continued to mislead investors by misrepresenting the issues surrounding the alleged short-term competitive pressures. The Company's statements failed to disclose the true impact of the price increase and competition— that the price increase for Pylarify made early in 2025 created an opportunity for competitive pricing that compromised Pylarify's revenues and overall growth potential.

12

C.    **The Truth Emerges**

38.    On August 6, 2025, Lantheus issued a press release announcing financial results for its second quarter of 2025. The Company disclosed that Pylarify had sales of $250.6 million, a decrease of 8.3%. Defendant Markison was quoted in the release stating that the Company "navigated increased competition in the PSMA PET landscape, which impacted PYLARIFY performance."

39.    That day, the Company held a call with analysts and investors to discuss the recently released results. During that call, Defendant Markison elaborated on the reasoning behind Pylarify's disappointing results, stating:

> This morning, we announced second quarter results that were below expectations and also lowered our financial outlook for the remainder of 2025. Before I go into the broader steps that we are taking to diversify our business and establish a new growth trajectory for the company, I want to drill down on PYLARIFY and the current dynamics in the PSMA PET market.
>
> In the back half of the quarter, the confluence of MUC-based reimbursement and aggressive discounting by what had been a somewhat dormant F-18 competitor, led some economically sensitive customers to reassess their choice of PSMA agents. This led to the renegotiation of some existing strategic partnerships as well as a conscious decision to walk away from those volumes at certain accounts that requested pricing terms that were not in the long-term interest of our PSMA PET franchise.
>
> PYLARIFY also continues to be concentrated in large institutions that due to constraints continued to grow at a slower rate than the overall market. However, our strategic partnership agreements have proven and will continue to prove effective at retaining the vast majority of our customers, who recognize PYLARIFY's clinical differentiation.
>
> This is reflected in our U.S. quarterly volume growth, 2% year-over-year and over 4% sequentially.

40.    Defendant Marshall provided more specifics on Pylarify's performance and announced that Lantheus would be decreasing its guidance for 2025 yet again:

> Consolidated net revenue for the second quarter was $378 million, a decrease of 4.1%. Radiopharmaceutical oncology currently PYLARIFY contributed $250.6

million of sales, down 8.3%, lower than previously expected. Our U.S. volumes were up over 4% sequentially, as described by Paul, competitive dynamics have driven the net price environment lower than expected.

*     *     *

Turning now to our updated guidance for full year 2025. Based on market dynamics, our go-forward strategy and extrapolating out from what we saw in the latter part of Q2 and accounting for anticipated mix of wins and losses, we are adjusting our PYLARIFY range to $940 million to $965 million.

We do not anticipate any changes to other existing products but for the inclusion of LMI in our forward view, specifically Neuraceq, which we expect to be in the range of $40 million to $45 million and $0.04 of EPS contribution for partial Q3 and full Q4 inclusion. Taken together, full year revenue is now expected to be in a range of $1.475 billion to $1.51 billion from the prior range of $1.55 billion to $1.585 billion.

Taking these revenue changes into consideration and the inclusion of LMI, we now see adjusted EPS in the range of $5.50 to $5.70 versus the prior guide of $6.60 and $6.70

41.     During the question-and-answer segment, Defendant Blanchfield elaborated on changes to the Company's guidance, stating:

Notably, we expect net price to continue to decline sequentially in both the third and the fourth quarter for PYLARIFY. This is due to the pricing actions in both renegotiations that took place in the second quarter in the back half that will then fully quarterize, if you will, for the third quarter as well as in the fourth quarter.

And then we also expect to see some impact on best price or 340B. That's a 2-quarter lag from a government pricing perspective. And so volumes for PYLARIFY will continue to grow as they have in the first half of this year, but we will see that less in the market, and we will see further price degradation given some of the competitive dynamics and those are the underlying assumptions baked within our guidance.

42.     The statements made contradicted those made during the call on May 7, 2025. During that call, the Defendants claimed that it was only temporary competition that was impacting Pylarify's sales growth, reiterated their confidence in Pylarify's growth potential and premium price point, and provided adjusted financial projections that took into account the risks raised by

the ongoing competition and pricing dynamics. In truth, Pylarify's increased pricing had increased a gap that allowed competition to worsen and threatened Pylarify's market position.

43.     The price of Lantheus' common stock declined dramatically on this news. The Company's common stock fell 28.8%, from a closing price of $72.83 per share on August 5, 2025, to close at $51.87 per share on August 6, 2025.

**D.      Defendants' Misconduct Has and Continues to Harm the Company**

44.     As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the Securities Class Action, as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

45.     The Defendants failed to oversee and manage the Company in accordance with their fiduciary duties. Lantheus' reputation and goodwill have also been damaged by the Defendants' misconduct.

**E.      Lantheus Issues False and Misleading Proxy Statements**

46.     In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue a false and misleading proxy statement during the Relevant Time Period, specifically the Schedule 14A Proxy Statements issued on March 21, 2025 (the "2025 Proxy"), that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

47.     The Director Defendants drafted, approved, reviewed, and/or signed the 2025 Proxy before they were filed with the SEC and disseminated to the Company's stockholders. The Director Defendants negligently issued materially misleading statements in the 2025 Proxy. These allegations are based solely on negligence, they are not based on any allegations of recklessness

or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not

sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of,

or reference or any allegation of fraud, scienter, or recklessness with regard to the 2025 Proxy

allegations and related claims.

48.     In support of re-electing themselves, Defendants Heino, Ber, Eastland and Leno

highlighted their supposed oversight of the Company in the 2025 Proxy. The 2025 Proxy stated:

> The Company's management is primarily responsible for the day-to-day
> management of the Company. However, the Board believes that oversight of risk
> management is one of its fundamental responsibilities and has delegated to its
> committees oversight and management of specific risks, on which those committees
> report to the Board. The Audit Committee is primarily responsible for oversight of
> the quality and integrity of the Company's financial reporting process, internal
> controls over financial reporting, certain compliance programs and information
> technology systems, processes and data, including cybersecurity and physical
> security. The Talent and Compensation Committee is responsible for reviewing
> compensation-related risks, non-CEO senior management succession planning,
> human capital management and management compensation programs, and legal
> and regulatory compliance and risks with respect to employee compensation and
> employee-related matters. The Nominating and Corporate Governance Committee
> is responsible for oversight of the Company's corporate governance, CEO
> succession planning and corporate sustained value creation, including enterprise
> risk management, corporate responsibility and ESG initiatives, and legal and
> regulatory compliance and risks with respect to non-"good practice" (GxP) ethics
> and compliance matters, including data privacy. The Science and Technology
> Committee is responsible for advising on scientific, technological, medical,
> regulatory, product safety, GxP compliance and intellectual property matters
> related to the Company's existing products, clinical development programs and
> business development opportunities. Management regularly reports to the Board
> and its committees on the risks that the Company may face and the steps that
> management is taking to mitigate those risks.

49.     The 2025 Proxy thus assured stockholders that the Director Defendants understood

Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken

to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in

their oversight duties by allowing the Company to operate with inadequate internal controls which

resulted in the failure to disclose or prevent the Defendants from causing the Company to make

materially false and misleading statements concerning the impact of price increases on competition for Pylarify, which would weaken Pylarify's market position and decrease sales.

50.     As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect Defendants Heino, Ber, Eastland, and Leno to the Board.

**F.    The Board Breached its Fiduciary Duties**

51.     As officers and/or directors of Lantheus, the Defendants owed Lantheus fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Lantheus in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of Lantheus, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

52.     Defendants, because of their positions of control and authority as directors and/or officers of Lantheus, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Lantheus' financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

53.     To discharge their duties, the officers and directors of Lantheus were required to exercise reasonable and prudent supervision over the management, policies, practices and controls

of the Company. By virtue of such duties, the officers and directors and Lantheus were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b)     Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d)     Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f)     Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g)     Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

54.     The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

55.     The Board's Audit Committee is tasked with overseeing Lantheus's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of Lantheus's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include:

- review management's design and maintenance of the Company's internal control over financial reporting and disclosure controls and procedures, including reviewing and discussing with management and the independent auditor: (i) any reports by management or the independent auditor of a material weakness or significant deficiency in internal control over financial reporting and management's certification in the Company's periodic SEC reports concerning the Company's disclosure controls and procedures, (ii) the actions taken to remedy any such material weakness or significant deficiency and any changes in circumstances that have, or are reasonably likely to have, a material effect on internal control over financial reporting, (iii) management's annual assessment of the adequacy of the Company's internal control over financial reporting, (iv) if the Company is required to have its independent auditor provide an annual attestation report regarding the Company's internal control over financial reporting, that attestation and (v) any identified act of fraud, whether or not material, that involves management or other

employees who have a significant role in the Company's internal control over financial reporting or disclosure controls and procedures;

- reviewing and discussing with management, the independent auditor and a member of the Internal Audit function, prior to public release, the Company's annual and quarterly financial statements to be filed with the SEC, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," the analyses prepared by management setting forth significant accounting and financial reporting issues and judgments made in connection with the preparation of the financial statements (including analyses of the effects of alternative GAAP methods on the financial statements and critical audit matters) and other such matters for which discussion will be required by applicable and related PCAOB standards for the Committee to make a recommendation to the Board as to whether such financial statements should be included in the Company's Annual Report on Form 10-K or any Quarterly Report on Form 10-Q; and

- discuss with management earnings press releases and, at management's request, review other financial information and earnings guidance provided to analysts and to rating agencies, including any such dissemination of financial information not involving the presentation of financial measures in accordance with GAAP.

56.    In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Leno, Eastland, Mäusli, and Pruden conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

57.    In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate

information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

58.     The Defendants' flagrant violations of their fiduciary duties have inflicted, and will continue to inflict, significant harm on Lantheus.

## DERIVATIVE ALLEGATIONS

59.     Plaintiff brings this action derivatively in the right and for the benefit of Lantheus to redress injuries suffered by Lantheus as a direct result of the Director and Officer Defendants' breaches of fiduciary duty.  Lantheus is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

60.     Plaintiff will adequately and fairly represent the interests of Lantheus in enforcing and prosecuting the Company's rights.

61.     Plaintiff was a stockholder of Lantheus at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Lantheus stockholder.

## DEMAND FUTILITY ALLEGATIONS

62.     Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

63.     The Lantheus Board currently has 11 members: Defendants Markison, Heino, Baylor-Henry, Ber, Eastland, Leno, Mäusli, McHugh, Morrow, Pruden, and Thrall.

64.     Plaintiff has not made any demand on Lantheus' current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is

incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

65.     The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

66.     The Director Defendants' making, or authorization of the false and misleading statements discussed above caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Lantheus. The failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. The Director Defendants could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

### A.    Demand is Excused as to Defendant Markison

67.     Defendant Markison is the Company's CEO. Defendant Markison received compensation of $1,189,020 in 2024. Defendant Markison depends on Lantheus for his income.

In addition, Lantheus stated in the 2025 Proxy that Defendant Markison is not independent pursuant to Nasdaq rules.

68.     Defendant Markison served as a director of the Company during the Relevant Time Period. As a director, Defendant Markison had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Markison was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

69.     Defendant Markison failed to conduct oversight of the Company's internal controls over financial reporting, and the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Lantheus' controls, Defendant Markison failed to protect corporate assets.

70.     In addition, Defendant Markison is a named defendant in the Securities Class Action.

71.     Thus, Defendant Markison faces a substantial likelihood of liability.

**B.     Demand is Excused as to Defendant Heino**

72.     Defendant Heino served as the Company's CEO from 2015 to 2024. Defendant Heino received compensation of $787,596 in 2024 and $12.5 million in 2023. In addition, Lantheus stated in the 2025 Proxy that Defendant Heino is not independent pursuant to Nasdaq rules.

73.     Defendant Heino served as a director of the Company during the Relevant Time Period. As a director, Defendant Heino had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Heino was also

required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

74.     Defendant Heino failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Lantheus's controls, Defendant Heino failed to protect corporate assets.

75.     Defendant Heino knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Heino breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Heino faces a substantial likelihood of liability for these breaches, making any demand on Defendant Heino futile.

**C.     Demand is Excused as to Defendant Ber**

76.     Defendant Ber served as a director of the Company during the Relevant Time Period. As a director, Defendant Ber had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Ber was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

77.     Defendant Ber failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Lantheus's controls, Defendant Ber failed to protect corporate assets.

78.     According to the 2025 Proxy, Defendant Ber received $475,906 in compensation in connection with his role as a Company director. Defendant Ber is not otherwise employed.

Accordingly, Defendant Ber cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

79.     Defendant Ber knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Ber breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Ber faces a substantial likelihood of liability for these breaches, making any demand on Defendant Ber futile.

80.     In addition, Defendants Ber and Mäusli served on Board of Directors for Progenics Pharmaceuticals, Inc. from November 2019 until it was acquired by Lantheus. Both Defendants Ber and Mäusli served as executive officers of Advanced Accelerator Applications S.A., which was co-founded by Defendant Ber, from 2003 until 2018. Defendants Ber and Mäusli have worked closely together for over 20 years, making them incapable of independently or disinterestedly considering a demand.

**D.    Demand is Excused as to Defendant Eastland**

81.     Defendant Eastland served as a director of the Company during the Relevant Time Period. As a director, Defendant Eastland had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Eastland was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

82.     Defendant Eastland failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Lantheus's controls, Defendant Eastland failed to protect corporate assets.

83.     According to the 2025 Proxy, Defendant Eastland received $284,682 in compensation in connection with her role as a Company director. Accordingly, Defendant Eastland cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

84.     Defendant Eastland served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for oversight of the adequacy and effectiveness of Lantheus's internal controls over financial reporting and its disclosure controls and procedures. The Audit Committee was thus responsible for reviewing and approving Lantheus's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Eastland was thus responsible for knowingly or recklessly allowing the improper statements related to the impact of price increases on competition for Pylarify, which would weaken Pylarify's market position and decrease sales.

85.     Defendant Eastland knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Eastland breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Eastland faces a substantial likelihood of liability for these breaches, making any demand on Defendant Eastland futile.

### E.     Demand is Excused as to Defendant Leno

86.     Defendant Leno served as a director of the Company during the Relevant Time Period. As a director, Defendant Leno had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Leno was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

87.    Defendant Leno failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Lantheus's controls, Defendant Leno failed to protect corporate assets.

88.    According to the 2025 Proxy, Defendant Leno received $494,656 in compensation in connection with his role as a Company director. Defendant Leno is not otherwise employed. Accordingly, Defendant Leno cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

89.    Defendant Leno served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for oversight of the adequacy and effectiveness of Lantheus's internal controls over financial reporting and its disclosure controls and procedures. The Audit Committee was thus responsible for reviewing and approving Lantheus's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Leno was thus responsible for knowingly or recklessly allowing the improper statements related to the impact of price increases on competition for Pylarify, which would weaken Pylarify's market position and decrease sales.

90.    Defendant Leno knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Leno breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Leno faces a substantial likelihood of liability for these breaches, making any demand on Defendant Leno futile.

**F.    Demand is Excused as to Defendant Baylor-Henry**

91.    Defendant Baylor-Henry served as a director of the Company during the Relevant Time Period. As a director, Defendant Baylor-Henry had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business,

operations, prospects, internal controls, and financial statements were accurate. Defendant Baylor-Henry was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

92.     Defendant Baylor-Henry failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Lantheus's controls, Defendant Baylor-Henry failed to protect corporate assets.

93.     According to the 2025 Proxy, Defendant Baylor-Henry received $483,406 in compensation in connection with her role as a Company director. Accordingly, Defendant Baylor-Henry cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

94.     Defendant Baylor-Henry knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Baylor-Henry breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Baylor-Henry faces a substantial likelihood of liability for these breaches, making any demand on Defendant Baylor-Henry futile.

95.     In addition, Defendants Baylor-Henry, McHugh, and Pruden held high level positions at Johnson & Johnson before joining the Board. Prior to 2015, Defendant Baylor-Henry served as the Worldwide Vice President for Regulatory Affairs for the Medical Devices and Diagnostics. Around the same time, Defendant Pruden served as Worldwide Chairperson in the Medical Devices division, and Worldwide Chairperson of Global Surgery Group. Defendant McHugh served as Company Group Chairperson for the Worldwide Virology business unit, as

well as President of Centocor, Inc., a subsidiary of Johnson & Johnson. Their longstanding business relationships make them incapable of independently or disinterestedly considering a demand.

### G. Demand is Excused as to Defendant Mäusli

96.     Defendant Mäusli served as a director of the Company during the Relevant Time Period. As a director, Defendant Mäusli had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Mäusli was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

97.     Defendant Mäusli failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Lantheus's controls, Defendant Mäusli failed to protect corporate assets.

98.     According to the 2025 Proxy, Defendant Mäusli received $482,156 in compensation in connection with his role as a Company director. Defendant Mäusli is not otherwise employed. Accordingly, Defendant Mäusli cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

99.     Defendant Mäusli served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for oversight of the adequacy and effectiveness of Lantheus's internal controls over financial reporting and its disclosure controls and procedures. The Audit Committee was thus responsible for reviewing and approving Lantheus's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Mäusli was thus responsible for knowingly or

recklessly allowing the improper statements related to the impact of price increases on competition for Pylarify, which would weaken Pylarify's market position and decrease sales.

100.    Defendant Mäusli knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Mäusli breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Mäusli faces a substantial likelihood of liability for these breaches, making any demand on Defendant Mäusli futile.

101.    In addition, Defendants Ber and Mäusli served on Board of Directors for Progenics Pharmaceuticals, Inc. from November 2019 until it was acquired by Lantheus. Both Defendants Ber and Mäusli served as executive officers of Advanced Accelerator Applications S.A., which was co-founded by Defendant Ber, from 2003 until 2018. Defendants Ber and Mäusli have worked closely together for over 20 years, making them incapable of independently or disinterestedly considering a demand.

**H.    Demand is Excused as to Defendant McHugh**

102.    Defendant McHugh served as a director of the Company during the Relevant Time Period. As a director, Defendant McHugh had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant McHugh was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

103.    Defendant McHugh failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Lantheus's controls, Defendant McHugh failed to protect corporate assets.

104.    According to the 2025 Proxy, Defendant McHugh received $483,406 in compensation in connection with her role as a Company director. Defendant McHugh is not otherwise employed. Accordingly, Defendant McHugh cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

105.    Defendant McHugh knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant McHugh breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant McHugh faces a substantial likelihood of liability for these breaches, making any demand on Defendant McHugh futile.

106.    In addition, Defendants Baylor-Henry, McHugh, and Pruden held high level positions at Johnson & Johnson before joining the Board. Prior to 2015, Defendant Baylor-Henry served as the Worldwide Vice President for Regulatory Affairs for the Medical Devices and Diagnostics. Around the same time, Defendant Pruden served as Worldwide Chairperson in the Medical Devices division, and Worldwide Chairperson of Global Surgery Group. Defendant McHugh served as Company Group Chairperson for the Worldwide Virology business unit, as well as President of Centocor, Inc., a subsidiary of Johnson & Johnson. Their longstanding business relationships make them incapable of independently or disinterestedly considering a demand.

**I.    Demand is Excused as to Defendant Morrow**

107.    Defendant Morrow served as a director of the Company during the Relevant Time Period. As a director, Defendant Morrow had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Morrow was also

required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

108.    Defendant Morrow failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Lantheus's controls, Defendant Morrow failed to protect corporate assets.

109.    Defendant Morrow knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Morrow breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Morrow faces a substantial likelihood of liability for these breaches, making any demand on Defendant Morrow futile.

**J.    Demand is Excused as to Defendant Pruden**

110.    Defendant Pruden served as a director of the Company during the Relevant Time Period. As a director, Defendant Pruden had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Pruden was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

111.    Defendant Pruden failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Lantheus's controls, Defendant Pruden failed to protect corporate assets.

112.    According to the 2025 Proxy, Defendant Pruden received $494,656 in compensation in connection with his role as a Company director. Defendant Pruden is not

otherwise employed. Accordingly, Defendant Pruden cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

113.    Defendant Pruden served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for oversight of the adequacy and effectiveness of Lantheus's internal controls over financial reporting and its disclosure controls and procedures. The Audit Committee was thus responsible for reviewing and approving Lantheus's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Pruden was thus responsible for knowingly or recklessly allowing the improper statements related to the impact of price increases on competition for Pylarify, which would weaken Pylarify's market position and decrease sales.

114.    Defendant Pruden knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Pruden breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Pruden faces a substantial likelihood of liability for these breaches, making any demand on Defendant Pruden futile.

115.    In addition, Defendants Baylor-Henry, McHugh, and Pruden held high level positions at Johnson & Johnson before joining the Board. Prior to 2015, Defendant Baylor-Henry served as the Worldwide Vice President for Regulatory Affairs for the Medical Devices and Diagnostics. Around the same time, Defendant Pruden served as Worldwide Chairperson in the Medical Devices division, and Worldwide Chairperson of Global Surgery Group. Defendant McHugh served as Company Group Chairperson for the Worldwide Virology business unit, as well as President of Centocor, Inc., a subsidiary of Johnson & Johnson. Their longstanding business relationships make them incapable of independently or disinterestedly considering a demand.

### K.    Demand is Excused as to Defendant Thrall

116.    Defendant Thrall served as a director of the Company during the Relevant Time Period. As a director, Defendant Thrall had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Thrall was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

117.    Defendant Thrall failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Lantheus's controls, Defendant Thrall failed to protect corporate assets.

118.    According to the 2025 Proxy, Defendant Thrall received $490,906 in compensation in connection with his role as a Company director. Accordingly, Defendant Thrall cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

119.    Defendant Thrall knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Thrall breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Thrall faces a substantial likelihood of liability for these breaches, making any demand on Defendant Thrall futile.

120.    Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that this individual breached his fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

## COUNT I

### Breach of Fiduciary Duty
### (Derivatively Against the Director Defendants)

121.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

122.    Each of the Director Defendants owed and owes Lantheus the highest obligations of loyalty, good faith, due care, and oversight.

123.    Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

124.    The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

125.    In addition, the Director Defendants further breached their fiduciary duties owed to Lantheus by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls, which resulted in the misrepresentations and failure to disclose the impact of price increases on competition for Pylarify, which would weaken Pylarify's market position and decrease sales. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

126. The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

127. As a direct and proximate result of the breaches of duty alleged herein, Lantheus has sustained and will sustain significant damages.

128. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

129. Plaintiff, on behalf of Lantheus, has no adequate remedy at law.

### COUNT II

### Breach of Fiduciary Duty
### (Derivatively Against the Officer Defendants)

130. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

131. The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe Lantheus the highest obligations of loyalty, good faith, due care, oversight, and candor.

132.     The Officer Defendants breached their fiduciary duties owed to Lantheus by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose the impact of price increases on competition for Pylarify, which would weaken Pylarify's market position and decrease sales. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

133.     As a direct and proximate result of the breaches of duty alleged herein, Lantheus has sustained and will sustain significant damages.

134.     As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

135.     Plaintiff, on behalf of Lantheus, has no adequate remedy at law.

**COUNT III**

**Gross Mismanagement
(Against All Defendants)**

136.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

137.     By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation

138.     As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

139.     As a direct and proximate result of the gross mismanagement and breaches of duty alleged herein, Lantheus has sustained and will sustain significant damages.

140.    As a result of the misconduct alleged herein, the Defendants are liable to the Company.

141.    Plaintiff, on behalf of Lantheus, has no adequate remedy at law.

## COUNT IV

### Waste of Corporate Assets
### (Derivatively Against All Defendants)

142.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

143.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Time Period. It resulted in continuous, connected, and ongoing harm to the Company.

144.    As a result of the misconduct described above, the Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

145.    As a direct and proximate result of the waste of corporate assets and breaches of duty alleged herein, Lantheus has sustained significant damages.

146.    As a result of the misconduct alleged herein, the Defendants are liable to the Company.

147.    Plaintiff, on behalf of Lantheus, has no adequate remedy at law.

## COUNT V

### Unjust Enrichment
### (Derivatively Against the Officer Defendants)

148.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

149.    By their wrongful acts, violations of law, and false or misleading statements or omissions of material fact that they caused to be made, the Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

150.    The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

151.    Plaintiff, on behalf of Lantheus, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

### COUNT VI
### Violation of Section 14(a) of the Exchange Act
### (Against the Director Defendants)

152.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

153.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege

39

and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

154.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2025 Proxy. In the 2025 Proxy, the Board solicited stockholder votes to reelect Defendants Heino, Ber, Eastland, and Leno to the Board.

155.    The 2025 Proxy, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated Section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Lantheus misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect Defendants Heino, Ber, Eastland, and Leno.

156.    Plaintiff, on behalf of Lantheus, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2025 Proxy in connection with the improper reelection of Defendants Heino, Ber, Eastland, and Leno to the Board.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Lantheus and that Plaintiff is a proper and adequate representative of the Company;

B.    Against all of the Defendants and in favor of Lantheus for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C.    Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.    Awarding Lantheus restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 31, 2025                    **ROWLEY LAW PLLC**

                                           */s/ Shane T. Rowley*
                                           Shane T. Rowley (SR0740)
                                           Danielle Rowland Lindahl
                                           50 Main Street, Suite 1000
                                           White Plains, NY 10606
                                           Tel: (914) 400-1920
                                           Fax: (914) 301-3514
                                           Email: srowley@rowleylawpllc.com
                                           Email: drl@rowleylawpllc.com

                                           *Attorneys for Plaintiff*